USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_____1/13/17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

TRINA SOLAR US, INC.,                                 :
                                                      :
                                     Petitioner,      :
                                                      :            16-CV-2869 (VEC)
                 -against-                            :
                                                      :            MEMORANDUM
JRC-SERVICES LLC and JASMIN SOLAR PTY                  :            OPINION & ORDER
LTD.,                                                 :
                                                      :
                                   Respondents.  :
------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

Petitioner Trina Solar US, Inc. ("Trina") brings this action against Respondents JRC-

Services LLC ("JRC") and Jasmin Solar Pty Ltd. ("Jasmin") to confirm an arbitration award

pursuant to which Respondents were ordered to pay Petitioner approximately $1.3 million.

Respondents have moved to vacate the arbitration award.  For the reasons discussed below, the

Court denies Respondents' motions to vacate and confirms the arbitration award.

## BACKGROUND

Trina, a California company, manufactures and sells solar panels and is a wholly-owned

subsidiary of Trina Solar Ltd., a Chinese Company.  JRC Mem. 5 (Dkt. 10); Trina Jasmin Opp. 2

(Dkt. 20).[1]  Jasmin is a private Australian company that sells and installs solar panels in

Australia.  Jasmin Mem. 2 (Dkt. 16).  JRC, a private administrative and marketing company

located in Nevada, purchased solar panels from Trina.  JRC Mem. 5-7; Jasmin Mem. 2-7; Trina

Jasmin Opp. 2-5.  The parties dispute whether JRC was acting as Jasmin's agent when it did so.

---

[1]      The Court cites to JRC's Memorandum of Law as "JRC Mem." and to Jasmin's Memorandum of Law as
"Jasmin Mem."  The Court cites to Trina's brief in opposition to Jasmin's motion to vacate as "Trina Jasmin Opp."
and Trina's brief in opposition to JRC's motion to vacate as "Trina JRC Opp."  JRC and Jasmin's replies are cited as
"JRC Reply" and "Jasmin Reply," respectively.

There is no dispute, however, that JRC became an agent for Jasmin in May 2012 in order to help Jasmin buy solar panels for its Australian customers.  *See* Mazzola Decl. Ex. C Tr. 463:23-464:13, 568:21-569:11 (Dkt. 18-3); *id.* Ex. D Tr. 631:4-11 (Dkt. 18-4).  Richard Carson was JRC's CEO and owner.  *Id.* Ex. C Tr. 568:18-20.  Matthew Starr, Jasmin's managing partner, provided Carson with a Jasmin email address, and Carson used that email address and a Jasmin signature block in his communications with Trina.  *Id.* Ex. C Tr. 458:8-22, 461:12-463:8, 546:20-23; *see e.g.*, *id.* Ex. I (Dkt. 18-9).  In August 2012, Carson executed a document entitled "Arrangement of rights and obligations" that was provided to Trina.[2]  Malone Decl. Ex. 5 (Dkt. 11-5). That document provided, in part:

> We, Jasmin Solar, hereby certify that *JRC-Services LLC, 2301 Plaza Del Grande, Las Vegas, NV 89102*, will act as our agent for dealing with all the business between our company and Trina Solar.
>
> We authorize *JRC-Services LLC* as our agent, to purchase solar modules products for our company from Trina Solar.  *JRC-Services LLC* is the agent of Jasmin Solar, all their rights and obligations to sign any agreement with Trina solar[sic] is authorized by our company.

*Id.*  In that same document, Jasmin guaranteed payments by JRC and stated that the document was valid from July 30, 2012, through July 30, 2015.  *Id.*

Jasmin remained intimately involved throughout the relevant negotiations with Trina.  While Jasmin and JRC negotiated with Trina for the solar panels, Carson and Starr edited drafts of the contract under negotiation.  Mazzola Decl. Ex. C Tr. 545:3-8, 546:24-547:22.  Trina's main negotiating representative generally copied both Starr and Carson on relevant emails.  *Id.* Ex. C Tr. 540:22-541:19, 546:24-547:20.  It was clear

---

[2]        Carson stated in the arbitration that Trina had asked Carson to sign this document without inquiring whether Carson was a Jasmin officer or had the authority to sign on behalf of Jasmin.  Malone Decl. Ex. 23 ¶ 15 (Dkt. 11-23).  Carson did not deny that he had Jasmin's authority to sign the document,  Mazzola Decl. Ex. C Tr. 543:8-19, and, although it is odd that an agent would sign an agency agreement on behalf of its principal, the parties do not dispute the validity of this document.  The only dispute is whether the document applies to the ultimate purchase agreement between Trina and JRC.  *See* Jasmin Mem. 17.

during the negotiations that the solar panels JRC and Jasmin sought to purchase from

Trina were intended for Jasmin's use and that the panels would be tailored to Jasmin's

needs.  *See generally id.* Exs. E (Dkt. 18-5), H (Dkt. 18-8), J (Dkt. 18-10).  Toward the

end of the negotiating period, Starr instructed Trina that it should inform him of any

major issues immediately.  *Id.* Ex. H, at 1.

In November 2012, JRC executed a written contract with Trina to purchase solar panels

("PV Module Sales Contract" or "Contract").  JRC Mem. 7 (citing Malone Decl. Ex. 4 (Dkt. 11-

4)).  Jasmin was not a signatory, and the August 2012 "Arrangement of rights and obligations"

was not explicitly incorporated into the Contract.  *See generally* Malone Decl. Ex. 4.  The

Contract only referenced Jasmin once: it provided that concurrently with the effective date of the

Contract, Jasmin, as JRC's parent, would guarantee payment for shipments delivered pursuant to

purchase orders issued by JRC.  *Id.* Ex. 4 ¶ 5.5.1.[3]  The parties dispute whether it was Trina or

Jasmin who asked JRC to execute the PV Module Sales Contract instead of Jasmin.  Jasmin

Mem. 4; Trina Jasmin Opp. 4.[4]  Although JRC alone executed the PV Module Sales Contract,

---

[3]      Jasmin never provided a new guarantee to Trina.  Malone Decl. Ex. 25 ¶ 44 (Dkt. 11-25); *id.* Ex. 35 (Dkt. 11-35).  Trina did not argue and the Court does not conclude that the existence of the guarantee provision obligates Jasmin to arbitrate.  In addition, based on the record, the Court believes the Contract mistakenly stated that Jasmin was JRC's parent.  The Court acknowledges, as Jasmin pointed out during oral argument, that the guarantee in the Contract would be superfluous if JRC were executing the Contract as Jasmin's agent.  In that event, Jasmin would already be liable under the Contract as principal.  Jasmin argued at oral argument that the fact that the Contract called for Jasmin to execute a guarantee for JRC is inconsistent with the notion that JRC was executing as Jasmin's agent.  Tr. 14:19-15:12, 41:6-12.  Although it is odd that the contract calls for a guarantee from the party on whose behalf the Contract was allegedly signed, it is not inconsistent with JRC signing as agent.  Jasmin could have been simultaneously liable as principal and guarantor (if a guarantee had been executed); as Trina pointed out at oral argument, contracting parties often pursue a belt and suspenders approach.  Moreover, this approach is consistent with the approach taken by the parties in executing the "Arrangement of rights"—that document simultaneously provided that JRC was Jasmin's agent and that Jasmin was a guarantor for JRC.  It is thus conceivable that the parties were attempting to duplicate that approach in the Contract.

[4]      Trina was interested in executing the deal with JRC, a U.S. company, instead of Jasmin, an Australian company, because dealing with a U.S. company would be more convenient if the deal ended up in litigation and because Trina US and its sales representative would get the commission for the deal instead of Trina Australia.  Malone Decl. Ex. 27 Tr. 209:18-211:25 (Dkt. 11-27).  Trina possibly also wanted JRC to be the official counterparty because Jasmin did not satisfy Trina's headquarters' creditworthiness criteria for a line of credit.  Mazzola Decl. Ex. H, at 1; Malone Decl. Ex. 23, ¶¶ 21-22.  Jasmin was interested in having JRC execute the deal on its behalf in order

Jasmin acted as though it was a party to the Contract: purchase orders and sales invoices included Jasmin's address; Starr and Carson each signed various purchase orders; Jasmin received the solar panels directly from Trina in Australia; Jasmin received and installed the panels; and at least at one point in 2013, Jasmin told Trina that it intended to pay the invoices. Mazzola Decl. Ex. C Tr. 449:21-450:4; *id.* Ex. D Tr. 632:6-25, 872:2-12, 873:4-13; *id.* Exs. I, M (Dkt. 18-13), N (Dkt. 18-14).[5]  Moreover, Starr himself urgently asked Trina to deliver the panels in a timely manner. *Id.* Ex. I, at 7-9; Malone Decl. Ex. 32 (Dkt. 11-32).  Separately, Jasmin allegedly orally agreed with JRC that once it began to receive revenue from customers for whom it had installed panels, it would pay JRC.  Mazzola Decl. Ex. D Tr. 874:5-17.

According to JRC and Jasmin, Trina did not deliver the correct model of solar panels, and the panels that were delivered were late and defective.  Malone Decl. Ex. 23, at ¶¶ 33-39; *id.* Ex. 25, at ¶¶ 55-56, 59-61.  JRC refused to pay Trina asserting that Trina had knowingly falsely represented its ability to deliver the desired panels on the required schedule.  JRC Mem. 8; Trina JRC Opp. 4 (Dkt. 19); Trina Jasmin Opp. 5.

On May 16, 2014, Trina initiated arbitration against JRC and Jasmin pursuant to the arbitration clause in the PV Module Sales Contract.  JRC Mem. 8 (citing Malone Decl. Exs. 2 (Dkt. 11-2), 3 (Dkt. 11-3)).  Jasmin moved to dismiss for lack of jurisdiction asserting that it was not a party to the PV Module Sales Contract.  Malone Decl. Ex. 11 (Dkt. 11-11).  The Tribunal

---

to save on taxes under Australian law.  Malone Decl. Ex. 27 Tr. 210:6-10; Mazzola Decl. Ex. J, at 1-2.  Although the initial request to have JRC execute the Contract may have come from Trina, Malone Decl. Ex. 27 Tr. 213:16-19, it appears that as of November 1, 2012, possibly after several revisions including and excluding Jasmin as a party, the Contract was drafted with Jasmin as the counterparty, and on November 2, 2012, shortly before the Contract was due to be executed, Jasmin requested that JRC become the executing party in its place so that Jasmin could avoid certain taxes, Mazzola Decl. Ex. C Tr. 545:14-546:13; *id.* Ex. J; Malone Decl. Ex. 25 ¶ 22.

[5]      Jasmin argues that the purchase orders do not indicate that JRC was acting on behalf of Jasmin because it was Trina—not Jasmin—who addressed the purchase orders to Jasmin instead of to JRC.  Lockhart Decl. Ex. A Tr. 445:12-24, 527:4-14 (Dkt. 21-1).  Regardless, Starr and Carson approved the purchase orders that Trina had formatted with Jasmin's logo without objection, and Jasmin accepted delivery of the panels directly.

denied Jasmin's motion.  *Id.* Ex. 16 (Dkt. 11-16).  In order to maintain its objection, Jasmin did

not participate in the arbitration.  Malone Decl. ¶¶ 22, 25, 26 (Dkt. 11).

In the arbitration, Trina claimed it was owed $1,826,264 plus interest at an annual rate of

12%.  Malone Decl. Ex. 1, at 3 ¶ 11 (Dkt. 11-1).  JRC argued for $933,387 in reductions to any

amount that would be awarded and either no interest or interest at the rate of 0.1% (comparable

to the lessor statutory rate in 28 U.S.C. § 1961(a), which governs post judgment interest).  *Id.* Ex.

40, at 36-39, 45-53 (Dkt. 11-40)).  Following a three-day hearing, the Tribunal issued its final

award on January 22, 2016, finding JRC and Jasmin jointly and severally liable for $1,305,131

plus interest in accordance with 28 U.S.C. § 1961(a).  Malone Decl. Ex. 1, at 4 ¶ 1.  As agreed by

the parties, the Tribunal did not include reasons for its award.  *Id.* at 3 ¶ 10.  JRC and Jasmin

have filed separate motions to vacate the arbitration award.  Dkts. 9, 14.

## DISCUSSION

### I.       Legal Standard

Petitioner seeks to confirm the award and Respondents seek to vacate the award pursuant

to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New

York Convention"), as implemented by the Federal Arbitration Act ("FAA"), 9 U.S.C. § 201 *et*

*seq*.  The New York Convention "governs agreements that are commercial and . . . not entirely

between citizens of the United States," i.e., nondomestic disputes, and promotes the enforcement

of arbitration agreements to facilitate international business transactions.  *Republic of Ecuador v.*

*Chevron Corp.*, 638 F.3d 384, 391 (2d Cir. 2011) (quotation marks and citations omitted).  The

FAA implements the New York Convention and grants district courts the authority to confirm

nondomestic awards.  *See Republic of Ecuador*, 638 F.3d at 391; *Zeiler v. Deitsch*, 500 F.3d 157,

165 (2d Cir. 2007) (citing 9 U.S.C. § 207).

The New York Convention applies here because the arbitration included Jasmin, a foreign party. *See Telenor Mobile Commc'ns AS v. Storm LLC*, 584 F.3d 396, n.3 (2d Cir. 2009) (holding New York Convention governed because the dispute was between two foreign companies); Y*usuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*, 126 F.3d 15, 19 (2d Cir. 1997) (holding New York Convention governed because conduct at issue occurred in the Middle East between foreign and domestic parties).  Because the arbitration was conducted in the United States, *see* Malone Decl. Ex. 1, at 5, the FAA governs whether to confirm or vacate the arbitration award.  *Yusuf Ahmed Alghanim & Sons*, 126 F.3d at 21 ("We read Article V(1)(e) of the Convention to allow a court in the country under whose law the arbitration was conducted to apply domestic arbitral law, in this case the FAA, to a motion to set aside or vacate that arbitral award."); *see also Zeiler*, 500 F.3d at 164 (holding that although the arbitration was nondomestic (some of the assets at issue and some of the parties were foreign), because the arbitration took place in the United States, the awards were subject to the FAA provisions governing domestic arbitration awards).

"[T]he Court 'must' grant an order confirming an arbitration award 'unless the award is vacated, modified, or corrected' as prescribed in the statute."  *iPayment, Inc. v. 1st Americard, Inc.*, No. 15 CIV. 1904 (AT), 2016 WL 1544736, at *3 (S.D.N.Y. Mar. 25, 2016) (citing 9 U.S.C. § 9).  The FAA only permits vacatur of an arbitration award:

    (1)  where the award was procured by corruption, fraud, or undue means;

    (2)  where there was evident partiality or corruption in the arbitrators, or either of them;

    (3)  where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

      (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).  A district court may also vacate an arbitration award that is rendered in "manifest disregard of the law" or in violation of well-defined public policy.  *Schwartz v. Merrill Lynch & Co.*, 665 F.3d 444, 451-52 (2d Cir. 2011).  When reviewing an arbitration award, "courts must grant an arbitration panel's decision great deference."  *Wallace v. Buttar*, 378 F.3d 182, 189 (2d Cir. 2004) (quotation marks and citation omitted).  The purpose of this "very limited review" is "to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation."  *Folkways Music Publishers, Inc. v. Weiss*, 989 F.2d 108, 111 (2d Cir. 1993).  "A party moving to vacate an arbitration award has the burden of proof, and the showing required to avoid confirmation is very high."  *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006)

## II.        Jasmin's Motion to Vacate the Arbitration Award Is Denied

      Jasmin moves to vacate the arbitration award pursuant to section 10(a)(4) of the FAA on the ground that the Tribunal exceeded its authority by issuing an award against Jasmin.  Jasmin asserts that the Tribunal lacked jurisdiction because Jasmin was not a party to the PV Module Sales Contract.  The Tribunal found that it had jurisdiction over Jasmin because (1) JRC was Jasmin's actual and apparent agent, and (2) Jasmin was estopped from objecting to jurisdiction because it received direct benefits from the PV Module Sales Contract.  Malone Decl. Ex. 16, at ¶¶ 18, 19, 34.  The Court agrees with the Tribunal's finding that JRC had actual authority to act as Jasmin's agent, although whether JRC also had apparent authority is less clear based on the record before the Court.  The Court also agrees with the Tribunal's finding that Jasmin directly benefit from the Contract and was thus estopped from objecting to arbitration.

### A. *De Novo* Review Applies and Jasmin Has Not Waived Its Objection

Whether Jasmin was a party to the arbitration agreement or otherwise bound by it is a question of arbitrability. *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452 (2003) (holding questions of arbitrability "include certain gateway matters, such as whether the parties have a valid arbitration agreement at all"). Given that there has been no "clear and unmistakable" showing that the parties agreed to arbitrate arbitrability, the Court reviews *de novo* the Tribunal's decision that Jasmin was bound by the arbitration agreement although not a signatory to it. *Consol. Rail Corp. v. Metro. Transp. Auth.*, No. 95 CIV. 2142 (LAP), 1996 WL 137587, at *8 (S.D.N.Y. Mar. 22, 1996) (explaining "that without a clear and unmistakable showing that a party agreed to arbitrate arbitrability a district court must review the arbitrator's decision on arbitrability *de novo*" (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)); *see also Schneider v. Kingdom of Thailand*, 688 F.3d 68, 71 (2d Cir. 2012).

Despite Trina's argument to the contrary, Jasmin has not waived its objection to arbitration. Jasmin repeatedly objected to the Tribunal's jurisdiction and refused to participate after the Tribunal denied its motion to dismiss, Malone Decl. ¶¶ 10, 11, 14, 15, 22, and the Tribunal acknowledged Jasmin's objection, *id.* ¶¶ 25, 26. *See Opals on Ice Lingerie v. Bodylines Inc.*, 320 F.3d 362, 368-69 (2d Cir. 2003) (holding party did not waive objection to arbitration because it repeatedly objection to the arbitration). Even when a party opposing arbitration "does not seek to enjoin the arbitration," as Jasmin chose not to do, "it can raise the arbitrability issue in a judicial confirmation proceeding." *Nat'l Ass'n of Broad. Employees & Technicians v. Am. Broad. Co.*, 140 F.3d 459, 462 (2d Cir. 1998). Moreover, "merely arguing the arbitrability issue to an arbitrator does not indicate a clear willingness to arbitrate that issue, i.e., a willingness to be effectively bound by the arbitrator's decision on that point." *First Options of Chicago, Inc.*, 514 U.S. at 946.

**B.  The Arbitration Agreement Was Enforceable Against Jasmin Because JRC Was Jasmin's Agent and Because Jasmin Is Estopped from Objecting to Arbitration**

"Because an agreement to arbitrate is a creature of contract . . . the ultimate question of whether the parties agreed to arbitrate is determined by state law."  *Bell v. Cendant Corp.,* 293 F.3d 563, 566 (2d Cir. 2002).  The PV Module Sales Contract provides that New York law applies, Malone Decl. Ex. 4 ¶ 10, and there is no question that Jasmin did not sign the agreement. Nevertheless, a nonsignatory may be bound to arbitrate pursuant to several different common law principles arising under contract and agency law, including agency and estoppel, which are applicable here.[6]  *See Thomson-CSF, S.A. v. Am. Arbitration Assoc.*, 64 F.3d 773, 776 (2d Cir. 1995).

**1.  JRC Was Acting As Jasmin's Agent When It Executed the PV Module Sales Contract**

"It is black letter law that an agent binds his principal when he enters into a contract within the scope of his authority."  *Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc.*, 241 F. Supp. 2d 246, 260 (S.D.N.Y. 2002) (citing *British American & Eastern Co. v. Wirth Ltd.*, 592 F.2d 75, 80 (2d Cir. 1979)).  An agent may have either actual or apparent authority.  Actual authority, which may be express or implied, "exists when an agent has the power 'to do an act or to conduct a transaction on account of the principal which, with respect to the principal, he is privileged to do because of the principal's manifestation to him.'"  *Id.* (quoting *Minskoff v. American Exp. Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir. 1996)).

JRC undoubtedly had actual authority to act as Jasmin's agent for the purpose of purchasing solar panels from Trina—including when executing the PV Module Sales Contract.

---

[6]      Jasmin also argues that it may not be forced to arbitrate under an alter ego theory.  The Court need not address this issue because Jasmin is bound to arbitrate under agency and estoppel doctrines, but the Court suspects, based on the facts available in the record suggesting a lack of adherence to corporate formalities between Jasmin and JRC, that if the record had been developed on this issue, an alter ego theory might also be applicable.

Both Starr and Carson acknowledged that JRC began acting as Jasmin's agent in May 2012. Mazzola Decl. Ex. C Tr. 463:23-464:13, 568:21-569:5. The "Arrangement of rights and obligations" explicitly stated that JRC was Jasmin's agent in its business dealings with Trina, and it also explicitly stated that it was valid through July 30, 2015, well after the PV Module Sales Contract was executed in November 2012. Malone Decl. Ex. 5. Nothing in the PV Module Sales Contract indicates any intent to invalidate the provision in the "Arrangement of rights and obligations" providing that JRC was Jasmin's agent.[7] Jasmin authorized JRC's representative, Carson, to use a Jasmin email address and signature block in negotiations with Trina. Mazzola Decl. Ex. C Tr. 458:8-22, 461:12-463:8, 546:20-23; *see e.g.*, *id.* Ex. I. Jasmin continued to manifest its authorization that JRC act on its behalf during the negotiation, execution, and fulfillment of the PV Module Sales Contract because it was copied on—and often participated in—email exchanges between JRC and Trina. *Id.* Ex. C Tr. 540:22-541:19, 545:3-8, 546:24-547:22; *id.* Exs. H, I, J; Malone Decl. Ex. 32. There is no indication that Jasmin ever told JRC that it was withdrawing its authorization, despite being fully aware that JRC was assisting in negotiating and ultimately executing the Contract. The fact that JRC ultimately executed the Contract instead of Jasmin—regardless of whether it was at Jasmin's or Trina's request—does not affect the agency relationship that undeniably existed between Jasmin and JRC. Even after the execution of the Contract, Starr and Carson each signed various purchase orders that indicated delivery to Jasmin's address; Trina delivered the solar panels directly to Jasmin in Australia; and Jasmin accepted and installed the panels, at one point stating in an email to Trina on which JRC was copied that Jasmin would pay the invoices. *Id.* Ex. C Tr. 449:21-

---

[7]       The Contract's merger clause does not change that conclusion. The "Arrangement of rights and obligations" establishes JRC's authority to act on Jasmin's behalf; it does not affect or alter in any way the terms of the Contract.

450:4; *id.* Ex. D Tr. 632:6-25, 872:2-12, 873:4-13; *id.* Exs. I, N.  Jasmin's conduct post-Contract

execution is additional evidence that JRC had authority to execute the Contract on Jasmin's

behalf.  Accordingly, although only JRC executed the Contract, there is no question that JRC

was acting as Jasmin's agent throughout the negotiation, execution, and fulfillment of the

Contract.[8]

      Jasmin nevertheless argues that JRC was not acting as its agent when it executed the PV

Module Sales Contract because the Contract itself does not identify JRC as Jasmin's agent and

because the "Arrangement of rights and obligations" was not incorporated into the Contract.

Jasmin Mem. 15-21.  The cases cited by Jasmin in support of the proposition that a non-signatory

may not be compelled to arbitrate as a principal unless the contract itself indicates an agency

relationship are distinguishable because they are all specific to admiralty (cargo shipping and

charter parties).  *See Cont'l U.K. Ltd. v. Anagel Confidence Compania Naviera, S.A.*, 658 F.

Supp. 809 (S.D.N.Y. 1987); *Gen. Auth. For Supply Commodities v. S.S. Capetan Costis I,* 631 F.

Supp. 1488 (S.D.N.Y. 1986).[9]  As explained above, although the Contract did not explicitly state

---

[8]     During oral argument, Jasmin was not able to point to any of its own communications or internal documents indicating that Jasmin's understanding at the time the Contract was executed was that JRC was not acting as Jasmin's agent. Tr. 13:6-15.  Instead, Jasmin cited to Carson and Starr's witness statements from the arbitration. Tr. 39:23-41:5.  In his statement, Carson indicated that he did not believe the "Arrangement of rights and obligations" was valid after the Contract was executed; he did not state that JRC was not acting as Jasmin's agent when it executed the Contract.  Malone Decl. Ex. 23, ¶ 29.  In fact, Carson's witness statement supports a finding that JRC executed the Contract as Jasmin's agent—he states that in early November 2012, Starr *told him* that Jasmin still wanted to go forward with the Trina deal and that he *relied on* Starr's assurance in going forward with the deal. *Id.* at ¶ 31.  In his witness statement, Starr stated that he believed the "Arrangement of rights and obligations" was not part of the Contract, Malone Decl. Ex. 25 ¶¶ 22, 46, but that is not the same as a denial that JRC was acting as Jasmin's agent.  Starr also stated, however, that he understood that because JRC would be the sole executing party, "JRC would become the sole direct customer of Trina," which "meant that JRC would be a purchasing intermediary for Jasmin." *Id.* Ex. 25 ¶31.  This single statement, however, made in the context of litigation and not at the time the Contract was executed, is the sole bit of evidence suggesting that Jasmin understood that JRC was not acting as its agent when executing the Contract; this evidence does not outweigh all the other evidence discussed showing that Jasmin authorized JRC to act as its agent for the purpose of purchasing solar panels from Trina, including executing the Contract.

[9]     Jasmin also argues that it may not be compelled to arbitrate based on its role as guarantor for JRC or its status as a sister company of JRC.  Jasmin Mem. 16-17.  This Court does not rest its decision on either theory but

that JRC was signing on behalf of Jasmin, the facts taken together show that JRC was acting

within the scope of its authority as Jasmin's agent, which is all that is required to bind Jasmin.

Moreover, because Jasmin is bound under an agency theory and not an incorporation by

reference theory, the fact that the "Arrangement of rights and obligations" was not incorporated

into the Contract is of no moment.  Instead, under an agency theory, the "Arrangement of rights

and obligations" demonstrates that Jasmin actually authorized JRC to act on its behalf in all of its

business with Trina, including by signing a contract containing an arbitration provision.

Whether JRC also had apparent authority is a much closer question.  Apparent authority

"arises from the written or spoken words or any other conduct of the principal which, reasonably

interpreted, causes [a] third person to believe that the principal consents to have [an] act done on

his behalf by the person purporting to act for him.'"  *Hidden Brook Air, Inc.*, 241 F. Supp. 2d at

260 (quoting *Minskoff*, 98 F.3d at 708).  "These representations . . . need not be made through

actual contact between the principal and third party."  *Id.*

Jasmin's conduct and statements reasonably interpreted would lead a third party in

Trina's position to believe that it consented to JRC executing the Contract on its behalf.  Such

conduct and statements include, for example: the "Arrangement of rights and obligations" (even

if JRC actually executed the document, as explained *supra* in note 2); Starr's joint involvement

along with Carson in editing drafts of the contract under negotiation, Mazzola Decl. Ex. C

Tr. 545:3-8; Jasmin's participation on emails with JRC and Trina, *id.* Ex. C Tr. 540:22-541:19,

546:24-547:19; *id.* Exs. H, I, J; Malone Decl. Ex. 32; Jasmin's request to tailor the solar panels

to its needs; *see* Mazzola Decl. Ex. J, at 3-5; Starr's instruction to Trina's main negotiating

---

instead on the independent factual showing that JRC had actual authority to act as Jasmin's agent when executing
the PV Module Sales Contract.

representative that Trina should inform him of any major issues immediately, *id.* Ex. H, at 1; Starr's endorsement of the purchase order, *id.* Ex. I, at 7-9; and Jasmin's multiple demands to Trina after the Contract was executed that it deliver on time, *id.* Ex. I, at 9-11; Malone Decl. Ex. 32.

What undercuts a clear finding of apparent authority are Trina's statements suggesting it may have understood that JRC was not acting as Jasmin's agent.  Trina made the following statements, among others: in an internal memo referencing a different contract that was signed by Jasmin but not Trina, "This was never executed by Trina because Jasmin was not the client," Malone Decl. Ex. 36, at 2 (Dkt. 11-36); in an internal email sent after the Contract was executed, "All of the US contracts are being processed under JRC Services, LLC.  Effectively Jasmin Solar is no longer a client," *id.* Ex. 38 (Dkt. 11-38); in a similar email, "Our client is JRC Services . . . not Jasmin solar . . . we've removed Jasmin solar from the equation entirely . . .," *id.* Ex. 39, at 2 (Dkt. 11-39); and in an April 2013 email to Carson discussing money owed by JRC, "Even though we deliver to Jasmin Solar in Aus, JRC Services is technically Trina's client," *id.* Ex. 37, at 1 (Dkt. 11-37).

Trina's statements that Jasmin was not the client do not necessarily prevent a finding that Trina simultaneously believed that Jasmin authorized JRC to act on its behalf in executing the Contract.  Indeed, Trina's sales representative's description of JRC as "technically" the client is telling.  JRC may have been the client nominally for the purpose of avoiding certain taxes, procuring a sales commission, or securing a line of credit in order to push through the deal, as discussed *supra* in note 4, but that does not mean that Trina did not also reasonably understand that JRC was acting as Jasmin's agent for the purpose of purchasing solar panels.  Trina's interactions with Jasmin and JRC suggest that Trina understood that JRC signed the Contract on Jasmin's behalf.  Primarily, after the Contract was inked, Trina continued to deal with Jasmin

directly as if Jasmin were the customer, requesting Jasmin's endorsement of the purchase order, Mazzola Decl. Ex. I, at 4, setting the delivery destination on its purchase and sale orders to Jasmin directly, *id.* Ex. I, at 5-6, 13-14; *id.* Ex. K, at 2, and responding to Jasmin's complaints regarding untimely delivery, *id.* Ex. I, at 7-9; Malone Decl. Ex. 32.[10]  Moreover, JRC simultaneously could have been a party to the Contract responsible for its performance and Jasmin's agent, which would be consistent with Trina's statements and actions.  *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999) ("'In many cases the agent is a party to the contract made by him on behalf of a disclosed principal and, as such, is responsible for its performance.'" (quoting Restatement (Second) of Agency § 328 cmt. B)).

Taking into account the full record, the Court finds that it is likely that JRC had apparent authority to act on behalf of Jasmin when executing the Contract but relies exclusively on its finding that JRC had actual authority to hold that Jasmin was bound to arbitrate this dispute.

### 2.  Jasmin Directly Benefited from the Contract

"Under the estoppel theory, a company 'knowingly exploiting an agreement with an arbitration clause can be estopped from avoiding arbitration despite having never signed the agreement.'"  *MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 61 (2d Cir. 2001) (quoting *Thomson-CSF, S.A.*, 64 F.3d at 778) (internal marks omitted).  "[W]here a company 'knowingly accepted the benefits' of an agreement with an arbitration clause, even without signing the agreement, that company may be bound by the arbitration clause."  *Id.* (quoting *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1064 (2d Cir. 1993)).  For the estoppel theory to apply, the benefits must be direct, which is to say flowing directly from the agreement, rather than indirect, meaning that the "nonsignatory exploits the

---

[10]     Trina's sales representative also testified that he viewed JRC and Jasmin as "one in the same entity" and for that reason communicated with both Starr and Carson.  Mazzola Decl. Ex. C Tr. 540:22-541:9.

contractual relation of parties to an agreement, but does not exploit (and thereby assume) the agreement itself." *Id.* (citing *Thomson-CSF, S.A.*, 64 F.3d at 778-79).

Jasmin benefited directly from the PV Module Sales Contract. The Contract was a contract for the sale of goods, and those goods were purchased in accordance with Jasmin's specifications and delivered directly to Jasmin. *See* Mazzola Decl. Ex. C Tr. 449:21-450:4; *id.* Ex. D Tr. 632:6-25, 872:2-12, 873:4-13; *id.* Exs. E, H, J, I, M. The fact that Jasmin received the panels from Trina was not "merely incidental to the [C]ontract's execution" but "ar[ose] specifically" from the Contract and was "specifically contemplated by the relevant parties." *Life Techs. Corp. v. AB Sciex Pte. Ltd.*, 803 F. Supp. 2d 270, 276 (S.D.N.Y. 2011).[11] Moreover, whatever financing arrangement existed between JRC and Jasmin to pay for the panels, *see*

---

[11]     Jasmin argues that it did not directly benefit from the Contract because the Contract expressly precluded it from enforcing the Contract as a third-party beneficiary. Jasmin Mem. 22-23. But there is nothing inconsistent about simultaneously having obligations under a contract without having rights under the contract—parties may generally assign rights and obligations under a contract as they wish. Here, the Court finds not that Jasmin is entitled to enforce the Contract as a third-party beneficiary but that Jasmin benefited directly from the Contract and thus is bound to arbitrate pursuant to the estoppel doctrine.

During oral argument, Jasmin argued that it has not "exploited" the contract because it has not sued based on the contract, Tr. 16:11-16, and, in its brief, Jasmin argues more generally that it did not seek to enforce the Contract or otherwise rely on its terms in pursuing a claim, Jasmin Mem. 22. But a nonsignatory need not sue under a contract to "exploit" the contract for the purpose of the direct benefits theory of estoppel. *See, e.g.*, *Life Techs. Corp.*, 803 F. Supp. 2d at 276-79 (holding nonsignatory knowingly exploited a contract because it executed a separate licensing agreement for trademarks as required by the contract and used those trademarks in commerce, with knowledge of the contract containing the arbitration provision). The cases cited by Jasmin do not hold to the contrary. In *Lang v. First Am. Title Ins. Co.*, the court held that estoppel did not apply to the plaintiffs, nonsignatories to the arbitration agreement, because the mortgage in dispute was not a direct benefit of the lender title policy that contained the arbitration clause. No. 12-CV-266S, 2012 WL 5221605, at *4-5 (W.D.N.Y. Oct. 22, 2012). The court wrote that "because Plaintiffs could not bring a breach of contract claim based on the provisions of the lender title policy, it cannot be said that they are now exploiting a term of that agreement" in order to answer the defendant's argument that plaintiffs were exploiting the lender title policy by bringing their lawsuit. *Id.* at *4-5. The court did not hold that a nonsignatory must sue under a contract in order to "exploit" the contract for the purpose of the direct benefits theory of estoppel. *Id.* Similarly, in *Oxbow Calcining USA Inc. v. Am. Indus. Partners*, the Appellate Division wrote that "the party seeking to compel arbitration must demonstrate that the party seeking to avoid arbitration relies on the terms of the agreement containing the arbitration provision in pursuing its claim" in the context of explaining that the nonsignatory plaintiffs' lawsuit, by itself, did not establish that the plaintiff was exploiting the contract because the plaintiffs were not suing under the contract. 948 N.Y.S.2d 24, 29-30 (1st Dep't 2012). Moreover, the cases cited by the Appellate Division in support of that statement do not support the broad rule Jasmin attributes to *Oxbow*. *Id.* at 30. Here, Jasmin knowingly exploited the Contract. In addition to the examples provided above, Jasmin knowingly sought to enforce the Contract by demanding prompt delivery of the solar panels directly from Trina. Mazzola Decl. Ex. I, at 7-9; Malone Decl. Ex. 32.

Mazzola Decl. Ex. D Tr. 874:5-17, does not change the fact that the solar panels were always intended for Jasmin's use and were delivered directly to Jasmin.[12]

For all the reasons discussed above, the arbitration provision in the PV Module Sales Contract is enforceable against Jasmin.[13]

## III.    JRC's Motion to Vacate the Arbitration Award Is Denied

### A.  JRC Has Not Established that the Arbitration Was Fundamentally Unfair

JRC moves to vacate the arbitration award pursuant section 10(a)(3) of the FAA on the ground that the arbitration proceeding was fundamentally unfair.  *See* JRC Mem. 13-20.  Section 10(a)(3) permits vacatur if the arbitrator engaged in misconduct by (1) refusing to postpone the hearing where cause to do so has been shown, (2) declining to hear pertinent and material evidence, or (3) engaging in other misbehavior prejudicing the rights of a party.  9 U.S.C. § 10(a)(3).

JRC argues that the proceeding was fundamentally unfair because the Tribunal permitted Trina to flout its order to provide detailed witness statements in advance of the hearing.  On May 9, 2015, the Tribunal ordered the parties to provide witness statements incorporating "sufficient detail to stand as the evidence in chief of the witness at the hearing."  Malone Decl. Ex. 9 ¶ 23 (Dkt. 11-9).  JRC complied by providing Trina three detailed written witness statements, totaling approximately fifty pages and accompanied by dozens of exhibits.  JRC Mem. 15; *see generally* Malone Decl. Exs. 23, 24 (Dkt. 11-24), 25.  In contrast, according to JRC, Trina submitted a

---

[12]    Jasmin also argues that Trina should not benefit from the equitable estoppel doctrine because it misrepresented its ability to perform under the Contract and therefore has unclean hands.  Jasmin Mem. 23-26.  This argument, however, strikes the Court as a merits dispute going to whether Trina should receive full or partial compensation under the Contract.  It is not relevant to whether there is a binding arbitration agreement in the first instance.

[13]    Jasmin moved for discovery in the event the Court finds that there is ambiguity surrounding the Tribunal's jurisdiction.  Because there is no ambiguity, Jasmin's request for discovery is moot.

"skeletal" six-page declaration for its single witness that lacked detail and citations to exhibits. JRC Mem. 15; *see generally* Malone Decl. Ex. 22 (Dkt. 11-22). JRC asked the Tribunal for relief by either granting a default judgment or limiting Trina's case in chief to its six-page witness statement. Malone Decl. ¶ 29. The Tribunal permitted the arbitration hearing to proceed because, after reviewing the witness statement and hearing from counsel, it found that Trina's witness was unlikely to deliver any surprises during his testimony. *Id.* ¶ 30. JRC contends that the asymmetrical production of witness statements severely prejudiced JRC because it allowed Trina to prepare thoroughly for cross-examination while JRC did not have the same opportunity to do so. JRC complains that it was hindered from fully developing its defenses when cross-examining Trina's witness. JRC Mem. 16-20.

Trina responds that the Tribunal's failure to require it to provide a more detailed witness statement neither prejudiced JRC nor qualifies as misconduct by the Tribunal. Trina JRC Opp. 8-11. Trina emphasizes that the Tribunal did not restrict JRC's case-in-chief or its cross examination, *id.* 8-9, a point JRC conceded during oral argument, Tr. 34:2-5.

The Court agrees with Trina that the proceeding was not sufficiently unfair to warrant vacating the award, let alone that the Tribunal's decision to proceed with the hearing, despite Trina's failure to fully comply with the Tribunal's order, amounted to misconduct requiring vacatur. In order to vacate an arbitration award pursuant to section 10(a)(3), the arbitrator's misconduct must result in a fundamentally unfair arbitration proceeding. *Areca, Inc. v. Oppenheimer & Co.*, 960 F. Supp. 52, 54–55 (S.D.N.Y. 1997). "[I]f the arbitrator refuses to hear pertinent and material evidence to the prejudice of one of the parties, the arbitration award may be set aside." *Id.* at 54. Arbitrators "are afforded broad discretion to determine whether to hear evidence," *id.* at 55 (citing *Trade & Transport, Inc. v. Natural Petroleum Charterers Inc.*, 738 F. Supp. 789, 792 (S.D.N.Y. 1990), *aff'd*, 931 F.2d 191 (2d Cir. 1991)), but they also "must give

each of the parties to the dispute an adequate opportunity to present its evidence and argument,"
*Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir. 1997) (quotation marks and citation
omitted).  Thus, arbitral misconduct only "typically arises where there is proof of either bad faith
or gross error on the part of the arbitrator."  *In re Cragwood Managers, L.L.C. (Reliance Ins.
Co.)*, 132 F. Supp. 2d 285, 287 (S.D.N.Y. 2001) (quotation marks and citation omitted).

Here, the Tribunal afforded JRC an adequate opportunity to present its evidence and
arguments.  The hearing consisted of three days of live testimony, and JRC was able to present
its three witnesses and to admit 113 exhibits—the Tribunal excluded only two of JRC's proffered
exhibits.  Mazzola Decl. ¶ 7.  Both parties submitted post-hearing briefs and made closing
arguments.  *Id.* ¶ 8.

JRC claims that it was denied a fair and equal opportunity to prepare for cross-
examination because the witness statement it received from Trina was less detailed than the
witness statements it provided to Trina.  *See* JRC Mem. 16.  JRC argues that its cross
examination of Trina's witness was "hours" shorter than Trina's cross examination of JRC's
main witness and that JRC "could have achieved far more in demonstrating the level of
dishonesty . . . in which Trina engaged" had it been better prepared.  JRC Mem. 18, 20.  When
pressed at oral argument, however, JRC was unable to specify what evidence or argument it was
prevented from presenting in support of its affirmative defenses.  The closest JRC came to
identifying a specific example showing that it was prevented from making its case related to the
availability *vel non* of ZEP solar panel installation mounts from dealers in Australia.  Tr. 60:14-
63:13.  The availability of ZEP hardware was relevant to JRC's affirmative defense that Trina
had acted in bad faith and fraudulently because JRC and Jasmin were primarily convinced to do
business with Trina because of its representation that its panels, installed using ZEP installation
mounts, could be installed much faster than other types of solar panels.  When Trina was unable

to deliver the ZEP mounts, according to JRC, the entire rationale for buying Trina panels evaporated.  Tr. 61:1-10, 62:21-63:7.  JRC's counsel asserted that if he had had a more complete witness statement, he could have challenged Trina's witness's testimony that ZEP parts were available from Australian dealers because he could have researched the actual availability of ZEP dealers in Australia.  Tr. 61:21-62:15.  The Court notes, however, that Trina's witness statement clearly put JRC on notice of Trina's position that the ZEP parts could be obtained from local ZEP dealers.  Malone Decl. Ex. 22, at ¶¶ 11, 21, 25.

Courts vacate arbitration awards on the ground of fundamental unfairness when a party is precluded from introducing evidence or receiving discovery.  *See, e.g.*, *Tempo Shain Corp.*, 120 F.3d at 20 (holding arbitration was fundamentally unfair on account of omitted pertinent and material testimony); *Home Indem. Co. v. Affiliated Food Distributors, Inc.*, No. 96 CIV. 9707 (RO), 1997 WL 773712, at *4-5 (S.D.N.Y. Dec. 12, 1997) (holding arbitration was fundamentally unfair, in part, because of precluded discovery); *Teamsters, Chauffeurs, Warehousemen & Helpers, Local Union No. 506 v. E.D. Clapp Corp.*, 551 F. Supp. 570, 578 (N.D.N.Y. 1982), *aff'd sub nom. Teamsters, Chauffers v. Ed Clapp Corp.*, 742 F.2d 1441 (2d Cir. 1983) (holding arbitration was fundamentally unfair on account of omitted pertinent and material evidence).[14]  That is not this case.  Instead, JRC grumbles that it was prejudiced because

---

[14]     JRC cited these cases for the more general principle that a proceeding is fundamentally unfair and warrants vacatur when the arbitrator unfairly hampers one party's ability to present its case.  *See* JRC Mem. 13-14.  What these and other cases indicate, however, is that what qualifies as unfairly preventing one party from presenting its case for the purpose of vacating an award is the *preclusion* of pertinent evidence or discovery—not procedural rulings that may increase the difficulty in presenting one's case.  Other cases cited by JRC, *see* JRC Reply 6 (Dkt. 23), also support this distinction.  *See, e.g.*, *Iran Aircraft Indus. v. Avco Corp.*, 980 F.2d 141, 146 (2d Cir. 1992) (holding proceeding was fundamentally unfair because arbitrator disregarded evidence on account of its form even though the arbitrator had previously approved that form).  Even if evidentiary and discovery rulings other than the preclusion of material evidence or discovery could result in an arbitration being fundamentally unfair, for all the reasons discussed, this proceeding was not fundamentally unfair.

the level of detail afforded to each side to prepare for cross examination was asymmetric.[15]

Given that JRC failed to identify any specifically precluded evidence or argument, that JRC did

receive a witness statement (albeit one that was less fulsome than it would have liked), and that

the Tribunal had broad discretion to resolve evidentiary issues, JRC has not demonstrated that

the proceeding was fundamentally unfair nor that the Tribunal acted in "bad faith" or committed

"gross error."

### B.  The Award Is Not Indefinite, Incomplete, or Ambiguous and Will Not Be Vacated and Remanded

"The arbitrator's rationale for an award need not be explained, and the award should be

confirmed if a ground for the arbitrator's decision can be inferred from the facts of the case."

*D.H. Blair & Co.*, 462 F.3d at 110 (quotation marks and citation omitted).  "Only a barely

colorable justification for the outcome reached by the arbitrators is necessary to confirm the

award."  *Id.* (quotation marks and citation omitted).  "When an arbitration panel makes a lump

sum award without further explanation, courts generally will not look beyond the lump sum

award in an attempt to analyze the reasoning processes of the arbitrators."  *Rich v. Spartis*, 516

F.3d 75, 81 (2d Cir. 2008) (quotation marks and citation omitted).  Courts may, however, remand

an award for additional clarity when an award is so indefinite, incomplete or ambiguous that it

precludes the court from conducting judicial review.  *Id.* at 83.

Trina and JRC agreed to an unreasoned award, and the Tribunal delivered a lump-sum

award that was less than the total amount sought by Trina, apparently giving effect to at least

some of the setoffs requested by JRC.  Malone Decl. Ex. 1, at 3 ¶ 10, at 4 ¶ 1.  Nevertheless, JRC

requests that the Court vacate and remand the award on the ground that it is indefinite,

---

[15]     Although JRC also complains that it was "kept in the dark" about Trina's evidence, JRC Reply 3, the parties acknowledged during oral argument that they engaged in discovery prior to the arbitration hearing, Tr. 19:24-20:3, and there is no indication that JRC was surprised by any of the documents Trina used during the hearing.

incomplete, and ambiguous because it fails to specify the awarded value for each type of solar panel delivered by Trina.  JRC Mem. 21-23.  The failure to include that information in the award is significant, according to JRC, because it may be entitled to a refund on malfunctioning solar panels under a warranty, but without knowing the purchase price for those panels pursuant to the award, Trina and JRC cannot agree on an appropriate refund and may be forced to litigate.  JRC Mem. 22-23; JRC Reply 9.  In order to avoid litigation, JRC would like the Court to remand the award to clarify the value of the solar panels that the Tribunal used to calculate the award.  JRC Mem. 23.

JRC's request to remand is denied.  The purpose of the requested remand is not to facilitate judicial review but to give JRC additional information that may be strategically useful in its on-going dispute with Trina over the allegedly defective solar panels.  This award is not ambiguous, and there is no question as to what the Court is being asked to enforce by confirming the award—i.e., payment of $1,305,131 by JRC and Jasmin to Trina for solar panels delivered pursuant to the PV Module Sales Contract.  That amount appears to be justified in light of the Contract, the delivery of goods that were not wholly defective,[16] and JRC's admitted failure to pay.  *Cf. N.Y. Bus Tours, Inc. v. Kheel*, 864 F.2d 9, 12-13 (2d Cir. 1988) (remanding the award because it provided no clear instruction as to how a court asked to enforce the award should proceed given a condition precedent to enforcement was not fulfilled); *Americas Ins. Co. v. Seagull Compania Naviera, S.A.*, 774 F.2d 64, 67 (2d Cir. 1985) ("An ambiguous award should be remanded to the arbitrators so that the court will know exactly what it is being asked to enforce.").  Whether JRC may be entitled to a refund under a warranty—which was not before the arbitrator—is not relevant to the enforcement of the award.  In short, this is not an

---

[16]     Jasmin represented at oral argument that none of the panels is now working, Tr. 56:9-13, but that evidence was not before the Tribunal.

appropriate case for remand.  *See Ecopetrol S.A. v. Offshore Expl. & Prod. LLC*, 46 F. Supp. 3d

327, 346 (S.D.N.Y. 2014) (refusing to remand reward to determine whether party was entitled to

offset when paying the award because the purported right to offset was irrelevant to the review of

the award and the basis for the award was clear).[17]

## CONCLUSION

For the foregoing reasons, Respondents' motions to vacate the arbitration award are

DENIED, and the arbitration award is CONFIRMED.  The Clerk of Court is respectfully

directed to close docket entries 9 and 14 and to terminate the case.

**SO ORDERED.**


Date:  **January 13, 2017**                             **VALERIE CAPRONI**
       **New York, New York**                          **United States District Judge**

---

[17]        JRC also moved to remand the award on the basis that it is unclear whether the award is intended to hold
JRC liable if the award is vacated as to Jasmin on jurisdictional grounds.  JRC Mem. 23-24.  Because the Court does
not vacate the award as to Jasmin, JRC's argument is moot.